# Hassan A. Salih, M.D.

### v.

# Margaret Ann Lane

Record No. 920093

November 6, 1992

Present: All the Justices

*Gary A. Godard (Christine Mougin-Boal; Godard, West & Adelman,* on briefs), for appellant.

*R. Harvey Chappell, Jr. (Mary Metil Grove; John A. Keats; Joel M. Finkelstein; Christian, Barton, Epps, Brent & Chappell,* on brief), for appellee.

JUSTICE COMPTON delivered the opinion of the Court.

In this damage suit brought by a nurse anesthetist against a psychiatrist for injuries allegedly received during administration of electric shock therapy by the psychiatrist to a patient, the central

issue is whether the plaintiff's common-law action is barred on the ground that her exclusive remedy is under the Virginia Workers' Compensation Act (the Act).

In September 1990, appellee Margaret Ann Lane brought this action against appellant Hassan A. Salih, M.D., asserting that she was injured on September 14, 1988 in the Fairfax Hospital when electric current entered her body as the psychiatrist was administering electroconvulsive therapy (ECT) to one of his patients. The plaintiff alleged that the defendant failed to exercise reasonable care "in setting up, handling, and activating the electric shock equipment." Specifically, the plaintiff charged the defendant with failing to warn her and others "to stand clear of the stretcher and equipment before electronically activating the equipment" and failing to assure that they were indeed clear of the stretcher and equipment before delivering the electric shock. The defendant denied the allegations of negligence and asserted that the plaintiff was guilty of contributory negligence.

On the day before trial, the defendant filed a plea to the court's jurisdiction, asserting that the plaintiff's sole remedy was under the Act. The court refused to rule on the plea in advance of trial and took the matter under advisement.

After a four-day trial, a jury rendered a $1.2 million verdict in favor of the plaintiff. Overruling post-trial motions, including a motion based on the jurisdictional issue, the trial court entered judgment on the verdict. We awarded the defendant an appeal from the October 1991 final order.

On appeal, the defendant contends the trial court erred in failing to sustain the jurisdictional plea; in failing to rule as a matter of law that the defendant was free of negligence or, in the alternative, that the plaintiff was guilty of contributory negligence; and in refusing to set aside the verdict as excessive. According to settled principles of appellate review, we will consider the evidence in the light most favorable to the plaintiff, who comes to this Court armed with a jury verdict approved by the trial judge.

The record shows that ECT is the use of a small amount of electricity to induce a major seizure in a patient who has a severe psychiatric illness, notably severe depression. The use of anesthetic medication, muscle relaxants, and oxygen with the treatment has resulted in a minimal amount of medical risk to patients receiving ECT. While the medical profession does not know exactly "why

ECT works" to improve illness, it is known that ECT, as well as antidepressant medications, affect a number of brain chemicals.

The electricity is delivered by machines which are sophisticated enough to elicit a controlled seizure under precise conditions using low amounts of electricity. The machines are calibrated to deliver from five joules of energy up to a maximum of 100 joules. Ten joules of electricity, according to the evidence, would cause a ten-watt light bulb to flicker for one second.

Normally, three persons working together closely in a hospital administer the therapy. They are the attending psychiatrist, an anesthesiologist or nurse anesthetist, and another nurse. The patient lies face up on a stretcher or table. The anesthetist is at the patient's head, the other nurse at the patient's feet, and the psychiatrist is positioned to the patient's left near the machine.

The psychiatrist, who supervises the procedure and is regarded as "the chief of the team," readies the machine, attaches electrodes at the proper time to the patient's head, and usually inserts a bite block in the patient's mouth to prevent damage to the patient's teeth and jaw. The nurse anesthetist starts an intravenous (IV) line, administers anesthesia to put the patient to sleep, gives a muscle relaxant to paralyze the patient, and puts a mask on the patient's face to ventilate (breathe for) the patient. This necessitates the placing of the anesthetist's left hand along the left side of the patient's face "holding the mask on." The other nurse connects the patient to monitors measuring brain activity, heart rate, and degree of oxygenation.

When the patient is paralyzed and electrodes are in place, the nurse anesthetist removes the mask and the psychiatrist inserts the bite block. Then, the psychiatrist must assure that "everybody is away from the table" so that electrical shock to them can be avoided. Usually a verbal warning is given by the psychiatrist "before the stimulation takes place." In order to deliver the electric current, the psychiatrist presses a button on the machine. After the seizure occurs, the anesthetist begins to ventilate the patient again until the patient resumes breathing unassisted.

On the day in question, the plaintiff, age 31, was employed as a nurse anesthetist by Fairfax Anesthesiology Associates, Inc., which was responsible for "fulfilling all of the anesthesiology needs that arose at Fairfax Hospital." The plaintiff had earned college degrees in both nursing and in anesthesia.

The defendant, a medical doctor specializing in psychiatry, practiced as a professional corporation. The corporation's only employees were the defendant and a part-time secretary.

The plaintiff had been assigned by her employer to Fairfax Hospital where ECT was to be administered in a recovery room on that day. The plaintiff reported to the room along with another nurse shortly before 8:00 a.m. The patient was brought to the room and the defendant arrived. The monitors had been connected to the patient and the IV was in place.

After greeting the patient, the defendant told the plaintiff "it was all right to go ahead." The plaintiff then administered the anesthesia and the muscle relaxant and began to ventilate the patient. The defendant placed electrodes on the patient's temples in a strap that was around the patient's head. At that point, the defendant's hands were working within the plaintiff's hands and arms.

Next, according to the plaintiff, the electrodes were connected to the machine and the plaintiff "continued to ventilate." The patient was not completely relaxed. The plaintiff's left hand was along the left side of the patient's face holding the mask in place and her right hand was on top of the bag squeezing it; apparently, her left hand was touching an electrode.

At that point, a student nurse was in the room and the defendant was explaining the procedure to her. While still conversing with the student, the defendant "reached down and flipped the switch" on the machine. According to the plaintiff, "the next thing I knew my hand was up in the air." She felt a tingling "all through" her hand. The plaintiff exclaimed, "Salih, you got me." A bite block had not been inserted and the defendant gave no warning before the current was delivered.

After the incident, the plaintiff continued to ventilate the patient until "spontaneous respirations came along." The plaintiff's hand "was totally numb and very weak."

Pertinent to the central issue in the appeal, the record reveals the following facts, although sparse, on the jurisdictional question. At the time of the incident, the plaintiff had been directed by her employer to administer anesthesia pursuant to the privileges she and her employer had at Fairfax Hospital to perform anesthesia services only. All decisions regarding the administration of anesthesia, including the dosage of anesthesia and muscle relaxants, were made by the plaintiff with and under the supervision of her employer. Should an emergency develop with the patient resulting from any

anesthesia services rendered by the plaintiff, she was under orders to call for an anesthesiologist immediately to render emergency care.

All bills for the plaintiff's services were sent directly by her employer to the patient and were designated "anesthesia services." The equipment and medical supplies used by the plaintiff in administration of anesthesia were not furnished by the defendant but were furnished by her, her employer, or the hospital.

■ According to the record, the plaintiff's employer was not selected by the defendant for the ECT procedure in question and the plaintiff's employer had no contract with the defendant to supply anesthesia services to his patient.

■ In an affidavit, the plaintiff asserted that the defendant had no privileges to administer anesthesia at the Fairfax Hospital on the day in question and, according to the affidavit, "he was barred from engaging in the business of anesthesiology" at the hospital. According to the plaintiff, it was customary in the profession at the time of this incident "to utilize anesthesiologists as independent contractors to administer anesthesia to the psychiatric patients" at the hospital.

The record is silent upon the exact nature of the contract between the defendant and his patient for administration of ECT. The record shows, however, that the defendant billed the patient directly for the defendant's services. It also shows that the psychiatrist calls the hospital when he has decided that a patient is to have ECT, and the hospital fixes a time for the procedure and assigns a specific recovery room as the site of the therapy.

The parties stipulated out of the jury's presence that the plaintiff applied for and received workers' compensation benefits from her employer as a result of the claim she made arising from this incident.

The defendant contends that he was the statutory employer of the plaintiff. Therefore, according to the defendant, she is barred from bringing this common-law action and her compensation is limited to the benefits afforded under the Act. The defendant argues that he "essentially" is "a general contractor who subcontracts with the hospital to set up the ECT. The hospital then acts as a subcontractor to set up the anesthesia services on behalf of Dr. Salih. Ms. Lane, as an employee of the anesthesia group, was assigned to assist Dr. Salih in the administration of the ECT." The defendant contends

that the plaintiff was involved in the same trade, business, or occupation of the defendant because "her activity was a part of the overall contract with the patient to administer ECT."

Additionally, defendant contends that the plaintiff's activity constituted a subcontracted fraction of the overall contract between the defendant and his patient. Defendant maintains that where, as here, "the work from which the injury arose was necessary and integral to the completion of the overall contract, then all of the parties involved in the various aspects of that contract fall within the scope of" the Act. We do not agree with the defendant's contentions.

The relationships shown by the evidence, or lack of same, in this case just do not fit within any provision of the Act dealing with statutory employees or any of the decisions relied upon by the defendant. Former Code § 65.1-30, now § 65.2-302(B), which the defendant claims governs this case, provides that when a general contractor contracts with an owner to perform work which "is not a part of the trade, business or occupation of" the owner, and contracts with a subcontractor for the performance "of the whole or any part of the work," the general contractor becomes the statutory employer of the subcontractor's employees. Here, we must determine whether the work performed by the plaintiff's employer, admittedly an independent contractor, was part of the defendant's "trade, business or occupation." *See Cinnamon* v. *International Business Machines Corp.*, 238 Va. 471, 478, 384 S.E.2d 618, 621 (1989); *Bassett Furniture Indus., Inc.* v. *McReynolds* , 216 Va. 897, 901-02, 224 S.E.2d 323, 326 (1976). If it was, the plaintiff's exclusive remedy is under the Act; if it was not, the plaintiff may maintain this action at law based on negligence. We hold that it was not.

The record is devoid of evidence that the defendant was in the "trade, business or occupation" of providing anesthesia services. The defendant is a psychiatrist, not an anesthesiologist. Indeed, he did not have privileges to administer anesthesia at Fairfax Hospital. The plaintiff is a nurse anesthetist, not a psychiatrist. The plaintiff and her employer were not permitted to perform any services other than anesthesia services at the Hospital. The defendant billed his patient directly for his psychiatric services only. The plaintiff's employer billed the patient directly for anesthesia services only.

Admittedly, a psychiatrist may always perform ECT with anesthesia. But as this Court has previously said, the fact that the services are useful, necessary, or even absolutely indispensable to the work does not conclusively make them part of defendant's

"trade, business or occupation." *Shell Oil Co.* v. *Leftwich*, 212 Va. 715, 722, 187 S.E.2d 162, 167 (1972).

Not only does the record fail to establish that plaintiff's services are part of defendant's trade, business or occupation, but the record lacks evidence that the plaintiff's anesthesia services were even a subcontracted portion of the defendant's main contract with the patient. Actually, as we have said, the record is silent upon the details of the defendant's undertaking with his patient. Additionally, there is no evidence of the specifics of the defendant's relationship with Fairfax Hospital, including what services he may have been obligated to provide but subcontracted to the hospital. The record does establish, however, that the plaintiff's employer did not have any contract with the defendant to furnish anesthesia services to his patients. The defendant would schedule a patient for ECT through the hospital which, in turn, would make arrangements for anesthesia services.

In sum, the record shows that the plaintiff and her employer were engaged in the business of furnishing anesthesia services and that the defendant was in the business of furnishing psychiatric services, which included the administering of ECT but did not include anesthesia services. As the trial court observed, the plaintiff's work and the defendant's work were done independently of the other. Hence, the defendant was not the plaintiff's statutory employer because defendant did not prove that he acted as a general contractor on behalf of his patient within the meaning of Code § 65.1-30, nor did he prove that plaintiff was engaged in an activity that was part of defendant's trade, business, or occupation. *See Johnson* v. *Jefferson Nat'l Bank* , 244 Va. 482, 422 S.E.2d 778 (1992), decided today. Therefore, plaintiff's common-law action is not barred by the provisions of the Act upon which defendant relies.

The remaining issues in the case require no extended discussion. On the questions of primary negligence and proximate cause, the plaintiff's experts concluded that the defendant failed to maintain the proper standard of care for the safety of persons around the table during the ECT. Although there was a conflict, there was credible evidence that the defendant delivered the stimulation without a warning and that this deviation from the standard of care proximately caused the plaintiff's injuries. Similarly, there was a conflict in the evidence on the question whether the plaintiff was guilty of contributory negligence. But there was likewise credible evidence to support the jury's finding on that issue.

■ Finally, we cannot say that the amount of the verdict was excessive as a matter of law. The plaintiff's main injuries consisted of "an electrically induced injury to the brachial plexus of the left side, manifesting itself in pain and numbness, weakness and disordered sympathetic tone." This translates, according to the medical testimony, to irreparable damage to some of the nerves that "come out of your neck and go . . . down into your arm."

In addition, the plaintiff sustained an "inappropriate supraventricular tachycardia . . . from a very abnormal sympathetic nervous system." In other words, the plaintiff "has a rapid heart rhythm that comes from the upper chamber of the heart" caused by the electrical shock. A cardiologist testified that she may require surgery in the future to implant a pacemaker.

Also, an economist projected that the plaintiff's net loss from her permanent injuries, reduced to present value, was $1,661,376. This figure included loss of income and loss of retirement benefits.

Accordingly, we find no error in the trial court's rulings, and the judgment in favor of the plaintiff will be

*Affirmed.*