Present: All the Justices

LEONARD A. ROSEN, M.D., ET AL.

                                    OPINION BY
v.  Record No. 980371        JUSTICE LAWRENCE L. KOONTZ, JR.
                                   February 26, 1999
DARLENE GREIFENBERGER


            FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
                    Michael P. McWeeny, Judge


     In this medical malpractice suit, we consider whether the

trial court erred in giving a jury instruction on a physician's

duty to continue his services as long as they are necessary

where the evidence shows that another physician within the

treating physician's group practice had been advised that the

patient might need additional care during the treating

physician's temporary absence.

                            BACKGROUND

     "According to settled principles of appellate review, we

will consider the evidence in the light most favorable to the

plaintiff, who comes to this Court armed with a jury verdict

approved by the trial judge."  Salih v. Lane, 244 Va. 436, 438,

423 S.E.2d 192, 194 (1992).  The parties dispute much of the

evidence, including that relevant to the alleged primary

negligence of the treating physician.  However, because we

awarded an appeal limited to the issue of whether a particular

jury instruction was proper, we will recount only those facts

relevant to our resolution of that issue.  <u>Jeld-Wen, Inc. v.</u>
<u>Gamble</u>, 256 Va. 144, 146, 501 S.E.2d 393, 395 (1998).

Darlene Greifenberger first became a patient of Fairfax Ob-Gyn Associates, P.C. (the group practice) in 1988.  The group practice, a Virginia professional corporation, is owned by and operates the medical practice of three physicians:  Felicia L. Donald, M.D., Leonard A. Rosen, M.D., and Robert L. Castle, M.D. In 1988 and 1989, Greifenberger was treated by all three members of the group practice in relation to her pregnancy and the successful delivery of her second child.  Dr. Donald was Greifenberger's primary treating physician at that time, but Dr. Rosen treated Greifenberger during some obstetrical visits, and Dr. Castle delivered the child and administered Greifenberger's post-partum care.

Greifenberger continued as a patient of the group practice after this pregnancy, and on occasion received treatment from each of the three physicians.  In April 1992, Greifenberger requested that a Norplant contraceptive device be implanted. Dr. Donald performed the necessary procedure and later treated Greifenberger when she complained of complications from the implant.  Because of dissatisfaction with Dr. Donald's

treatment, Greifenberger requested that she no longer receive treatment from Dr. Donald.[1]

On September 17, 1992, Greifenberger contacted the group practice and advised a nurse there that she believed she was pregnant and that she was considering terminating the pregnancy. Dr. Rosen saw Greifenberger in the group practice's office that afternoon. A pregnancy test confirmed that Greifenberger was pregnant. Based upon her report of the date of her last menstrual cycle, Dr. Rosen estimated that the pregnancy was in the seventh or eighth week of the first trimester. After discussing the options for continuation or termination of the pregnancy with Dr. Rosen, including the recommendation of the manufacturer of the contraceptive device that it be removed if the pregnancy were continued, Greifenberger indicated that she wished to terminate the pregnancy through a therapeutic abortion. The next day she completed the necessary consent document and other paperwork required to schedule the abortion procedure.

---

[1]Greifenberger named Dr. Donald as an individual defendant in the action from which this appeal arises, asserting that Dr. Donald was negligent with respect to the implantation of the contraceptive device, the follow-up treatment related thereto, and Greifenberger's unwanted pregnancy. The jury returned a verdict in favor of Dr. Donald on these issues, and Greifenberger has not appealed that aspect of the judgment. Accordingly, the claims against Dr. Donald individually are no longer at issue in this case.

On September 22, 1992, Greifenberger was admitted to Fair Oaks Hospital as an outpatient under the care of Dr. Rosen to terminate her pregnancy. After a general anesthetic had been administered, but before the abortion procedure had been started, Dr. Rosen determined from an assessment of uterine size that the pregnancy was more advanced than he had previously thought, estimating that it was in the twelfth to fourteenth week of the first trimester. Because Greifenberger had been unequivocal in stating her desire to terminate the pregnancy and because the dilation and evacuation procedure Dr. Rosen intended to perform is medically appropriate to terminate a late first trimester pregnancy, Dr. Rosen decided to go forward with the procedure.

During the procedure, however, Dr. Rosen determined that the pregnancy had advanced beyond the fourteenth week. Because a dilation and evacuation procedure is not medically appropriate to terminate a more advanced pregnancy, Dr. Rosen discontinued the procedure after approximately ten minutes. Knowing that the procedure was incomplete, Dr. Rosen elected to send Greifenberger "home with a medication called Methargen to cause further medical uterine contractility to further expel whatever remaining products of conception were left behind" in the uterus. He also prescribed a "broad spectrum antibiotic in the form of Keflex" to protect her from infection.

4

Dr. Rosen then contacted Greifenberger's husband in the hospital waiting room and told him that "the operation went okay, that there [were] no problems." Dr. Rosen further told Greifenberger's husband that Greifenberger "would pass a small amount, a very small amount of tissue . . . that she might bleed . . . a little heavier than her normal menstrual cycle." Dr. Rosen did not specifically advise Greifenberger's husband that the abortion procedure was incomplete.

Greifenberger was instructed by a hospital discharge nurse to take additional doses of the antibiotics and Methargen and to use a prescription pain medication as needed. She was further instructed by the nurse to make an appointment with Dr. Rosen in one week and to "notify your doctor if you have heavy vaginal bleeding, severe abdominal pain or fever." Greifenberger was discharged from the hospital without having been informed that the abortion procedure was incomplete. Although Dr. Rosen gave her medication intended to induce uterine contractions and a spontaneous abortion to expel the remaining fetal tissue, he did not inform Greifenberger that he would be temporarily unavailable to treat her or that, if necessary, Dr. Castle would be treating her during Dr. Rosen's absence.

Dr. Rosen was scheduled to attend a medical conference in Chicago on the day following Greifenberger's surgery and was to leave that evening. Before leaving the hospital, Dr. Rosen

5

contacted Dr. Castle, the only member of the group practice who would be available for patient consultation and treatment that night and for the next several days, and informed him that Greifenberger's pregnancy had been more advanced than had been first thought.  Dr. Rosen further advised Dr. Castle "to expect a call" because "products of conception" had been left in the uterus and that Greifenberger had been sent home with antibiotics, pain medication, and the medication to cause uterine contractions to expel the remaining tissue.

In the early morning hours of September 24, 1992, Greifenberger contacted Dr. Castle complaining of "cramping" and "slight bleeding."  Dr. Castle was "expecting" the cramping because of the medication given to Greifenberger and advised her to take the prescribed pain medication and come to the group practice's office the next day.  Several hours later, her husband took Greifenberger to the emergency room.  At that time she was in significant pain and had a temperature of 101.  Dr. Castle was called to the hospital and performed surgery to complete the abortion.

On August 2, 1995, Greifenberger filed a motion for judgment against the group practice and against Dr. Rosen individually, alleging malpractice resulting from negligence or

6

gross negligence.[2]  Among the allegations of malpractice,
Greifenberger alleged that "Dr. Rosen's post-operative care
manifested an utter disregard of prudence amounting to a
complete neglect of the safety of plaintiff and lacked due
care."

After a period of extended discovery, a jury trial was held
in the trial court beginning on October 20, 1997.  Evidence in
accord with the above recounted facts was received along with
expert testimony on the relevant standard of care from witnesses
for both parties.  Dr. John Partridge, an expert witness for Dr.
Rosen, testified that the duty of continuing necessary treatment
does not require that physicians "be held hostage in our own
offices."  Rather, "[t]he standard of care requires that a
doctor have adequate backup, skillful backup, that there be a
communication flow on issues of importance between one doctor
and another [about what] the other doctor may have to handle."

At the conclusion of the evidence, Greifenberger proffered
the following jury instruction:

> A doctor who has accepted a patient for treatment
> has a duty to continue his services as long as they
> are necessary.  A doctor may not abandon his patient
> while the services are necessary, unless he gives
> notice to the patient and makes arrangements for

---

[2]Greifenberger also advanced theories of lack of informed
consent, battery, and emotional distress.  Theses claims have no
direct relevance to the issue presented by this appeal.

7

continuing treatment by another doctor.  If a doctor fails to perform this duty, then he is negligent.

The group practice and Dr. Rosen objected to the instruction, contending that it was not appropriate because the facts presented at trial did not establish a lack of continuing care.  Greifenberger contended that the instruction was appropriate because even if Dr. Rosen's association with the group practice and his communication to Dr. Castle satisfied his duty to continue necessary treatment, Dr. Rosen's failure to give notice to Greifenberger that he would not be available for consultation and further treatment nonetheless constituted a breach of that duty.

The trial court ruled that there was sufficient "evidence upon which a correct statement of the law can be given" as to the duty to continue necessary treatment.  Based on this ruling, the trial court granted Greifenberger's proffered instruction.

The jury returned its verdict in favor of Greifenberger against the group practice and Dr. Rosen, awarding her $175,000 in damages.  By order dated November 21, 1997, the trial court affirmed the jury verdict and award of damages.  We awarded the defendants this appeal limited to the issue whether the trial court erred in granting Greifenberger's jury instruction on the duty to continue necessary treatment.

8

It has long been the rule that a trial court should not give a jury instruction that, while a correct statement of the law as an abstract proposition, is inapplicable to the facts of the case. Gordon v. Virginia Electric & Power Co., 150 Va. 442, 450, 143 S.E. 681, 683 (1928); see also Parker v. McCoy, 212 Va. 808, 814, 188 S.E.2d 222, 226 (1972). Rather, the trial court should instruct the jury only on those theories of the case which find support in the evidence, see Neeley v. Johnson, 215 Va. 565, 575, 211 S.E.2d 100, 108 (1975)("an instruction should not be given which is unsupported by the evidence"), and the evidence relied on to support a proffered instruction must amount to "more than a scintilla." Hatcher v. Commonwealth, 218 Va. 811, 814, 241 S.E.2d 756, 758 (1978); see also Ring v. Poelman, 240 Va. 323, 327, 397 S.E.2d 824, 827 (1990).

The instruction at issue here, commonly known as an "abandonment" instruction, as an abstract proposition is arguably a correct statement of the law with respect to a physician's duty to continue to render treatment to a patient as long as may be necessary. We have previously addressed the nature of this duty, arising from the physician-patient relationship, by stating that "[a]fter a physician has accepted employment in a case it is his duty to continue his services as long as they are necessary. He cannot voluntarily abandon his

9

patient." Vann v. Harden, 187 Va. 555, 565, 47 S.E.2d 314, 319 (1948). We have further stated that "under certain circumstances, the physician has a right to withdraw from a case, provided the patient is afforded a reasonable opportunity to acquire the services he needs from another physician." Lyons v. Grether, 218 Va. 630, 634, 239 S.E.2d 103, 106 (1977). The essence of this duty is the responsibility of the treating physician to avoid a lapse in necessary treatment to the patient.

In the present case, Dr. Rosen contends that his action in turning over Greifenberger's treatment to Dr. Castle for the period of Dr. Rosen's absence did not constitute an abandonment of his duty to render continuing necessary treatment to her. Limiting our holding to the specific facts of this case, we agree with Dr. Rosen.

It is a matter of common knowledge and experience that physicians in a group practice regularly rotate "on-call" responsibility for a patient's treatment during non-office hours. Moreover, here the evidence showed that Greifenberger was aware that Dr. Rosen was a member of a group practice, that the other members of the group practice specialized in the same field of medicine, and that she had been treated by all three members of the group practice at various times. In addition, Greifenberger does not challenge Dr. Castle's qualifications to

provide the treatment she required in Dr. Rosen's absence, and she made no claim against Dr. Castle individually in this suit. Finally, the evidence shows that although Dr. Rosen did not advise Greifenberger of his intended absence, it is undisputed that he made adequate arrangements for her to contact and receive continuing treatment from Dr. Castle during that time. Accordingly, the evidence does not support abandonment or lack of continuing care of the patient that would justify the instruction in question.

Finally, Greifenberger contends that even if the trial court erred in giving the abandonment instruction, that error was harmless, and the judgment in her favor should be sustained since the evidence shows that Dr. Rosen was negligent in his entire course of treatment of her. We express no opinion on the issue of Dr. Rosen's primary negligence because that issue is not before us. However, it is undisputed that Greifenberger presented both the issues of abandonment and negligence by Dr. Rosen to the jury. The claim that a physician has abandoned a patient in need of urgent, continuing medical treatment, such as the present case, would undoubtedly tend to inflame the emotions of a jury. Under such circumstances, giving an erroneous instruction is not harmless. Rather, "[i]f an issue is erroneously submitted to a jury, we presume that the jury

11

decided the case upon that issue." Clohessy v. Weiler, 250 Va. 249, 254, 462 S.E.2d 94, 97 (1995).

CONCLUSION

For these reasons, we will reverse the judgment of the trial court and remand the case for a new trial.

Reversed and remanded.