Present: Hassell, C.J., Keenan, Koontz, Kinser, Lemons, and Agee, JJ., and Russell, S.J.

KEISHA DAGNER, ADMINISTRATRIX OF THE
 ESTATE OF CAROLINE DAGNER, DECEASED

OPINION BY
v.  Record No. 062134        JUSTICE LAWRENCE L. KOONTZ, JR.
                                    November 2, 2007
CHARLES ANDERSON, M.D.

FROM THE CIRCUIT COURT OF PRINCE EDWARD COUNTY
Richard S. Blanton, Judge

This appeal arises from a jury verdict in favor of an emergency room physician in a wrongful death medical malpractice action.  The dispositive issue presented is whether the circuit court erred in permitting the jury to consider the testimony of the physician's expert medical witness who had expressed an opinion that an alcohol withdrawal seizure rather than a diabetic seizure was the cause of the decedent's injury and death.  To resolve that issue, we consider whether such testimony was relevant to the question of the physician's alleged negligence in discharging the decedent from the emergency department of the hospital where she was being treated, and if so, whether the expert was qualified to express that opinion.

BACKGROUND

Because our consideration of this appeal is limited to discrete questions concerning the relevance and admissibility of expert witness testimony, we need recite only those facts

necessary to our resolution of the appeal. See, e.g., Budd v. Punyanitya, 273 Va. 583, 587, 643 S.E.2d 180, 181 (2007); Molchon v. Tyler, 262 Va. 175, 180, 546 S.E.2d 691, 695 (2001). We will recite the evidence in the light most favorable to the defendant, Charles C. Anderson, M.D., the prevailing party in the circuit court. See, e.g., Smith v. Irving, 268 Va. 496, 498, 604 S.E.2d 62, 63 (2004).

On the evening of September 22, 2000, Caroline A. Dagner (Dagner), a 52-year-old insulin-dependant diabetic, was transported to the emergency department of Southside Community Hospital in Farmville after being found unconscious in her apartment by her adult daughter, Keisha R. Dagner. It is not disputed that Dagner had taken her daily doses of insulin, had not eaten any solid food, and had consumed a considerable quantity of beer.[1] While en route to the hospital, emergency

---

[1] There is no dispute among the parties in this case that insulin is a naturally occurring substance normally produced in the pancreas that triggers the conversion of glucose in the bloodstream into glycogen, which is stored in the liver and muscle tissue, in order to reduce blood sugar levels. Dagner suffered from a form of diabetes mellitus, commonly referred to as diabetes, a chronic condition in which the body fails to produce adequate amounts of insulin to properly regulate blood sugar levels. Supplemental insulin, taken orally or by injections, is a standard treatment for diabetes. If a diabetic patient takes an insulin supplement, but does not consume food, the patient's blood sugar level will fall causing a hypoglycemic episode in which the patient may lose consciousness. Consumption of alcoholic beverages can exacerbate the effect of a hypoglycemic episode.

medical personnel determined that Dagner was likely suffering from hypoglycemia, that is, an abnormally low blood sugar level, and gave Dagner an injection of glucagon in an effort to stabilize her condition.[2]  Dagner responded positively to the glucagon treatment and began to regain consciousness.

Upon arrival at the emergency department of the hospital at 8:35 p.m., Dagner was evaluated by Kim Brown, R.N., a triage nurse, and was then examined by Dr. Anderson.  Both Nurse Brown and Dr. Anderson concurred that Dagner's condition was the result of diabetic hypoglycemia.  They also detected a smell of alcohol on Dagner's person and suspected that she might be intoxicated, a factor which would interfere with her body's ability to recover from the hypoglycemic episode.  Dr. Anderson ordered various laboratory tests to be conducted including a determination of Dagner's blood alcohol level (BAL).  He further directed that she be given a meal, and that she receive 50 milligrams of dextrose.[3]

---

[2] There is no dispute among the parties in this case that glucagon is a naturally occurring substance in the body that triggers the release of stored glycogen into the bloodstream and the production of glucose in the liver, thus raising blood sugar level.  An intramuscular injection of glucagon is a standard treatment for diabetic hypoglycemia when the patient is unable to take glucose orally.

[3] There is no dispute among the parties in this case that dextrose is a form of glucose and is frequently given to diabetic patients orally or by injection following a

While Dagner ate the meal, Dr. Anderson spoke with her about her routine for managing her diabetes. During this conversation, Dagner, who then appeared to be fully alert and responding normally, conceded that she had in the past encountered complications in managing her blood sugar level when consuming alcoholic beverages. Dr. Anderson warned her that she "should never drink [alcohol] again." After the laboratory tests were completed, which among other things showed that Dagner had a BAL of .24, Dr. Anderson discussed a management plan with Dagner, directing her to return home, measure her blood sugar level, eat a snack, and rest. He then discharged Dagner from the emergency department shortly after 10:00 p.m.

At Dagner's request, Nurse Brown called Keisha Dagner to advise her that Dagner would be discharged from the hospital and needed to be taken home. Keisha Dagner advised Nurse Brown that she would be unable to leave work and come to the hospital until the next morning. Dr. Anderson was not advised that Dagner would not be able to return home and follow the management plan as he had advised her.

_____

hypoglycemic episode in order to speed the natural recovery to a normal blood sugar level.

4

Dagner remained in the waiting area of the emergency department, unattended, for over eight hours after she was discharged by Dr. Anderson.  When hospital personnel next checked Dagner on the morning of September 23, she had a blood sugar level of 17 and was comatose and unresponsive.[4]  Dagner was admitted to the hospital and died on December 20, 2000 without regaining consciousness.

On September 18, 2002, Keisha Dagner, who had qualified as administratrix of her mother's estate, filed a motion for judgment in the Circuit Court of Prince Edward County alleging that Dagner's death was caused by the medically negligent acts of Dr. Anderson and Southside Community Hospital.  The action named Dr. Anderson, his employer Emergency Physicians of Farmville, P.C. (collectively, "Dr. Anderson"), and Southside Community Hospital as defendants.[5]  Dr. Anderson responded to the action by asserting, among other things, that his treatment of Dagner, and specifically his decision to discharge her, was not a breach of the applicable standard of care.

-----

[4] Dr. Anderson does not contest that when a person's blood sugar level declines below 20 milligrams per deciliter of blood and remains so for a prolonged period of time that brain damage and death are the likely result.

[5] The estate subsequently accepted a settlement from the hospital, which was dismissed from the action.

At trial, during the opening statement by counsel for Dr. Anderson, a computerized slideshow media presentation was shown to the jury that outlined Dr. Anderson's anticipated defense and included references to an alcohol withdrawal syndrome (AWS) seizure as the cause of Dagner's coma, brain injury, and death. The substance of Dr. Anderson's defense as outlined in this presentation was that his discharge of Dagner from the emergency department did not violate the standard of medical care because he could not have known that Dagner was subject to seizures as a result of AWS, and that it was just such a seizure that caused her coma, brain injury, and death.

During their direct testimony, counsel for the estate asked its expert witnesses, Dean Williams, M.D. and Anthony McCall, M.D., their opinions as to whether Dagner's coma, brain injury, and death were the result of an AWS seizure, rather than a diabetic seizure. Both experts opined that there was no evidence to support a diagnosis that Dagner had suffered an AWS seizure. Both experts further opined that Dr. Anderson had failed to comply with the standard of care that required him to protect Dagner from the consequences of her low blood sugar in combination with her intoxication from alcohol in making the decision to discharge Dagner from the emergency department. Dr. McCall explained that the combination of insulin and alcohol can be a "lethal

combination" for a diabetic such as Dagner.  In general terms, insulin lowers the blood sugar level and excessive alcohol in the bloodstream prevents the blood sugar from being stabilized because alcohol prevents the liver from producing more sugar, and the brain requires a constant supply of sugar to remain healthy.

In voir dire by Dr. Anderson's counsel, David L. Shank, M.D., who was Dr. Anderson's only expert witness, testified that he was "board certified in emergency medicine" and that he had "been . . . in the practice of full time emergency medicine since [1980]."  Dr. Shank further testified that he was "familiar with the standard of care for the care and treatment of diabetes and hypoglycemia."  Dr. Shank agreed that he was "familiar with something called alcohol withdrawal seizure" and that he would be concerned about the occurrence of such a seizure "[i]f someone who has been consuming significant alcohol stops consuming alcohol."  In the course of his practice of emergency medicine, Dr. Shank stated that "[i]t wouldn't be unusual . . . to see 5, 10, maybe 15 of those patients [suffering AWS seizures] in a year's time."  Over the objection of the estate, the circuit court qualified Dr. Shank "as an expert on the standard of care for an emergency room physician or emergency medicine physician" and,

after being prompted by counsel for Dr. Anderson, added that Dr. Shank was "qualified to speak as to causation."

During direct examination, counsel for Dr. Anderson asked Dr. Shank to "explain what caused [Dagner's] unresponsiveness" when she was found in the waiting area of the emergency department on September 23, 2000.  Dr. Shank stated that "[t]here are several things that we have to think about that could be the cause," but expressed the opinion that "the most likely cause was that she had an alcoholic withdrawal seizure."  Dr. Shank further opined that Dagner's alcohol withdrawal seizure was an "unforeseeable, unpredictable event" based on everything Dr. Anderson knew during his treatment of Dagner and at the time he discharged her from the emergency department.

During cross-examination, Dr. Shank conceded that only three to five percent of the people who have alcohol withdrawal also have seizures, and that such seizures are "readily treatable."  Dr. Shank acknowledged that if Dagner had been admitted to the hospital and been observed he would have expected her to survive.  Dr. Shank further acknowledged that Dagner's insulin level "was a significant factor" in causing her brain injury following her seizure, that the seizure could have had a "multifactorial cause," and that he was not an expert in such cases.  Dr. Shank stated that while

8

he did not "have a neurologist's perspective" on the causation of seizures, he maintained that he had "a reasonable physician's opinion since I'm in emergency medicine and see seizures." At the conclusion of his testimony, the estate moved to strike Dr. Shank's testimony as to causation on the ground that he was not qualified to offer an opinion on a seizure with multifactorial causes. The circuit court overruled the motion.

At the conclusion of all the evidence, the jury returned its verdict in favor of Dr. Anderson, and the circuit court entered judgment in accord with that verdict. We awarded the estate this appeal.

DISCUSSION

The estate contends that the circuit court erred in allowing the jury to consider evidence that Dagner's brain injury and subsequent death were caused by an AWS seizure. Specifically, the estate contends that the circuit court should not have permitted any testimony concerning AWS because it was not relevant to the standard of care required of Dr. Anderson in treating Dagner for hypoglycemia and in making the determination to discharge her from the emergency department. The estate also contends that evidence of alcohol use by Dagner was highly prejudicial and outweighed its probative value, if any. Even if the possibility that Dagner suffered

9

an AWS seizure was relevant and admissible, the estate further contends that Dr. Shank's opinion that Dagner had suffered such a seizure was inadmissible because Dr. Shank lacked the necessary qualifications to express that opinion.

Well established principles govern our consideration of the issues raised in this appeal. "A trial court's exercise of its discretion in determining whether to admit or exclude evidence will not be overturned on appeal absent evidence that the trial court abused that discretion." May v. Caruso, 264 Va. 358, 362, 568 S.E.2d 690, 692 (2002) (citing John v. Im, 263 Va. 315, 320, 559 S.E.2d 694, 696 (2002)). Likewise, "whether a witness is qualified to testify as an expert is 'largely within the sound discretion of the trial court.' " Perdieu v. Blackstone Family Practice Center, Inc., 264 Va. 408, 418, 568 S.E.2d 703, 709 (2002) (quoting Noll v. Rahal, 219 Va. 795, 800, 250 S.E.2d 741, 744 (1979)); see also Swersky v. Higgins, 194 Va. 983, 985, 76 S.E.2d 200, 202 (1953).

The issue before the jury in this case was whether Dr. Anderson's treatment of Dagner, and specifically his decision to discharge her from the emergency department rather than to delay discharge for further observation of her or to admit her to the hospital, fell within the applicable standard of care for a physician providing treatment to a patient suffering

10

from diabetes-related hypoglycemia in an emergency department setting. In this context, evidence as to the actual cause of Dagner's subsequent coma, brain injury, and death was clearly relevant to determining whether that standard of care was violated. Dagner's estate had the burden of showing that a reasonable emergency care physician, under the factual circumstances known to Dr. Anderson, would have recognized that Dagner's condition might worsen with respect to the actual cause of her subsequent brain injury and death, whether from a diabetes-related trauma or some other cause. If the cause of her brain injury and death resulted from, or was contributed to by, an AWS seizure as the defense maintained, then the estate would have been required to show that Dr. Anderson should have foreseen that possibility prior to discharging Dagner. Accordingly, we hold that the circuit court did not err in overruling the estate's motion to exclude evidence that Dagner may have suffered an AWS seizure.[6]

---

[6] The estate's reliance on Hemming v. Hutchinson, 221 Va. 1143, 1146, 277 S.E.2d 230, 232-33 (1981) and DeWald v. King, 233 Va. 140, 146, 354 S.E.2d 60, 63 (1987), for the proposition that evidence of Dagner's use or abuse of alcohol should have been excluded because the prejudice it was likely to engender in the jury outweighed its probative value is misplaced. As those cases make clear, evidence of alcohol use or abuse is not admissible unless it is relevant to an issue in the case. Here, the question whether Dagner's alleged abuse of alcohol contributed to her death by causing an AWS

11

We now turn to the question whether Dr. Shank should have been permitted to express an opinion that Dagner's brain injury and death were caused, at least in part, by an AWS seizure.  With respect to this issue, it is important to distinguish between the two areas in which Dr. Anderson sought to qualify Dr. Shank as an expert witness.  Dr. Anderson sought to qualify Dr. Shank as an expert on the standard of care owed by an emergency room physician providing treatment to a patient, such as Dagner, suffering from diabetes-related hypoglycemia in an emergency department setting.  Dr. Shank was clearly qualified to render such an opinion, and the estate does not contest his qualification on that ground.  However, Dr. Anderson also sought to have Dr. Shank qualified as an expert on the causation of a brain injury by seizures, and specifically as an expert capable of offering an opinion that Dagner had suffered an AWS seizure that was the cause, at least in part, of the brain injury that resulted in her death.

The estate contends that Dr. Shank was not qualified to offer such an opinion because he lacked the necessary background, training, and experience to offer an opinion as to the cause of Dagner's brain injury.  Specifically, the estate

seizure was clearly relevant to the defense's theory of the case.

notes that Dr. Shank conceded that he was not qualified to speak about the cause of seizures that may be multifactorial in nature. Dr. Anderson responds that Dr. Shank was qualified to give an opinion that Dagner suffered an AWS seizure based upon Dr. Shank's testimony that in his practice of emergency medicine he treats between 5 and 15 patients each year who suffer such seizures.

Generally, to qualify as an expert a witness needs only to have a degree of knowledge of a subject matter beyond that of persons of common intelligence and ordinary experience so that the witness' opinion will have value in assisting the trier of fact in understanding the evidence or determining a fact in issue. See Velazquez v. Commonwealth, 263 Va. 95, 103, 557 S.E.2d 213, 218 (2002); see also Sami v. Varn, 260 Va. 280, 284, 535 S.E.2d 172, 174 (2000). We are of opinion, however, that in this case Dr. Shank's stated familiarity with AWS in the context of treating patients in an emergency department setting is not a sufficient basis for the circuit court to have qualified him as an expert on the issue whether Dagner suffered an AWS seizure which was the cause of Dagner's brain injury and death.

Dr. Shank's own testimony established that the role of a physician providing emergency medical care was to assess the patient's condition and administer the necessary treatment to

13

stabilize the patient, not to provide long term care. While Dr. Shank noted that in this context emergency medicine "overlaps" with a number of medical specialties, he also acknowledged that, as a practitioner of emergency medicine, he did not have the requisite expertise to offer an opinion on whether there was a multifactorial cause to Dagner's brain injury, even though he was of opinion that complications from her diabetes would have contributed to that injury. Accordingly, we hold that the circuit court erred in finding that Dr. Shank was qualified to testify regarding his opinion that Dagner's brain injury was caused by an AWS seizure.

CONCLUSION

As we have previously noted, the thrust of Dr. Anderson's defense was that his discharge of Dagner from the emergency department when he did so did not violate a reasonable standard of medical care because it was not foreseeable that Dagner would suffer an AWS seizure after her diabetes-induced hypoglycemia had been treated and stabilized. We therefore must conclude that the improper admission of Dr. Shank's opinion testimony that Dagner had in fact suffered an AWS seizure, which was the only evidence offered to rebut the estate's evidence to the contrary, could have influenced the jury's determination that Dr. Anderson was not negligent. Accordingly, we will reverse the judgment of the circuit court

14

and remand the case for a new trial on all issues consistent with the views expressed in this opinion.[7]

Reversed and remanded.

---

[7] Because the evidence adduced in the new trial will likely be of a different quality and nature, we will not address the further contention of the estate that the evidence in Dagner's medical records provided an insufficient foundation to support Dr. Shank's opinion that Dagner had suffered an AWS seizure.  For the same reason, we need not address the estate's two remaining assignments of error concerning the admission of evidence of Dagner's alleged prior noncompliance with treatment plans for her diabetes and the alleged admission of uncorroborated hearsay statements by Dagner through the testimony of Dr. Anderson in violation of Code § 8.01-397.