Present: All the Justices

ANDREW MOLCHON, M.D.

OPINION BY
v. Record No. 002010          JUSTICE LAWRENCE L. KOONTZ, JR.
June 8, 2001

SANDRA P. TYLER, AS ADMINISTRATRIX OF THE
 ESTATE OF MICHAEL TYLER (DECEASED), ET AL.

FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
Kathleen H. MacKay, Judge

In this appeal, we consider whether the trial court properly confirmed a jury verdict in favor of the plaintiffs in a wrongful death action alleging medical malpractice in the negligent discharge of a psychiatric patient who subsequently died as a result of gunshot wounds inflicted by police officers in circumstances which the parties agree were the equivalent of suicide.

BACKGROUND

"According to settled principles of appellate review, we will consider the evidence in the light most favorable to the plaintiff, who comes to this Court armed with a jury verdict approved by the trial judge." Salih v. Lane, 244 Va. 436, 438, 423 S.E.2d 192, 194 (1992).

The decedent, Michael Lee Tyler, had a 20-year history of depression and substance abuse. Following the death of his father from cancer in December 1993, Tyler became severely

depressed and began to drink heavily.  Tyler was admitted to Dominion Hospital on May 5, 1994.  Dr. Andrew Molchon, a psychiatrist, was Tyler's admitting and treating physician.  Although Molchon determined that, once stabilized through inpatient treatment, Tyler would benefit from placement in a "structured residential situation," Tyler was discharged from Dominion Hospital on May 10, 1994, without directions to enter a structured program.  Tyler subsequently failed to keep a psychiatric outpatient appointment scheduled for him on Molchon's orders.

On May 14, 1994, Tyler attempted to commit suicide.  Following his suicide attempt, Tyler was treated at Fairfax Hospital and was then transferred to Dominion Hospital on May 16, 1994, where he was again placed under Molchon's care.  Molchon's admitting diagnosis reflects that Tyler was suffering from "[d]epression . . . most likely major depression . . . [a]lcohol dependence . . . [p]robable personality disorder of mixed type . . . overdose of multiple medications and self-inflicted lacerations of both wrists."

On May 18, 1994, Molchon's progress notes for Tyler state:  "I think that it is absolutely necessary for [Tyler] to have a structured living situation after discharge."  (Emphasis added).  The following day, Molchon noted that Tyler "report[ed] continuing suicidal ideation but [had] no fixed plan at this

time." Molchon's progress notes then state: "The problem is that without a structured living situation . . . it is unlikely that [Tyler] will be able to maintain sobriety for more than a few days at most. If he drinks, he will be a very high suicidal risk (as demonstrated by recent attempt)." (Emphasis added).

Over the course of the next several days, Tyler failed to respond satisfactorily to treatment and repeatedly indicated to hospital staff that he was "not ready" to be discharged because he was "not [yet] safe." Although various options for discharging Tyler to another psychiatric hospital or structured living situation were considered, no suitable facility had space immediately available. Molchon's progress notes during this period continue to emphasize the need to discharge Tyler to a structured living situation.

On May 23, 1994, Molchon determined that Tyler was "clinically no longer in need" of hospitalization, but acknowledged that the "[p]roblem now is finding an adequately structured living situation since without this he would be at risk for relapse into drinking." The following day, Tyler again expressed his concern that he was "not ready" to leave the hospital and his fear that he would relapse into alcohol abuse and again attempt suicide. Referring to this statement, Molchon's progress notes state: "My assessment of situation is that [Tyler] is using hospital[ization] inappropriately [and] is

3

using the spectre of further suicide attempts [and] relapse" to avoid being discharged.  However, noting Tyler's history of suicide attempts, Molchon decided to seek a second opinion as to Tyler's "readiness for [discharge]."

On May 26, 1994, Molchon's progress notes reflect his view that Tyler's "[treatment] plan is at stalemate."  Tyler's social worker at Dominion Hospital arranged for Tyler to have a pre-admission interview at the Northern Virginia Mental Health Institute (NVMHI).  However, Molchon cancelled Tyler's pass to leave the hospital to attend this interview, apparently out of concern that the two or three day waiting period for admission to NVMHI was incompatible with his plan to discharge Tyler as soon as possible and because Molchon did not "believe . . . that [Tyler] is [a] danger to self/or others" so as to meet the requirements for admission to NVMHI.

Molchon further indicated that he had discussed Tyler's case with the doctor from whom he had sought a second opinion, and that "it [was Molchon's] understanding" that this doctor agreed that Tyler did not need further acute, inpatient hospitalization.  Nonetheless, Molchon delayed making a final decision to discharge Tyler "over [Tyler's] protest" out of concern that there was a "risk that [Tyler] may 'act out' in order to get back into the system."

4

On May 27, 1994, Tyler's social worker arranged for him to have a pre-admission interview on June 3, 1994 for residential treatment at one of two facilities operated by Loudoun County Mental Health Services. The social worker advised Tyler that, in the interim between his discharge and this interview, he could seek assistance through an emergency services telephone line and that he should attend Alcoholics Anonymous meetings. Tyler indicated to the social worker that he might "sleep in his van" following discharge. Molchon's progress notes for that day indicate that Tyler had "reached MHB," meaning that he had reached the "maximum hospital benefit" provided by his insurance coverage and directed that he should be "discharg[ed] tomorrow — follow up plan as described above," apparently referring to the social worker's notes.

Molchon had no further contact with Tyler after May 27, 1994. On May 29, 1994, Tyler was discharged from Dominion Hospital on the order of Molchon's partner, who was on call for Molchon during the Memorial Day holiday weekend.

Late in the evening of May 30, 1994, after having attended an Alcoholic Anonymous meeting, Tyler went to the apartment of Sandra Tyler, his estranged wife. Tyler was distraught and indicated to his wife that he wanted to be readmitted to Dominion Hospital, saying that he did not "feel safe." Tyler's wife contacted the hospital and CMG, Tyler's medical insurance

5

carrier, but was advised that Tyler was not eligible for further inpatient treatment. Tyler became agitated and attempted to cut his wrists with a knife. He then barricaded himself in the bathroom.

Lieutenant John B. Patton, another police lieutenant, and two deputies of the Loudoun County Sheriff's Office arrived at the apartment in response to a telephone call from Tyler's wife. After two or three hours, Tyler emerged from the bathroom brandishing the knife and began to "scream and yell" at the deputies. Tyler's behavior was erratic; one moment calm and the next highly agitated. Tyler repeatedly asked the deputies to shoot him. Still brandishing the knife, Tyler rushed Lt. Patton, who fired his service weapon six times, killing Tyler. Although Tyler's wife testified that her husband did not appear to be intoxicated, an autopsy revealed that Tyler's blood alcohol level was .18 at the time of his death.

On April 7, 1999, the plaintiffs filed a wrongful death suit alleging that Molchon's discharge of Tyler from Dominion Hospital violated the applicable standard of care and was a proximate cause of Tyler's death.[1] Following a jury trial in

---

[1]Sandra Tyler filed suit in her capacity as administratrix, personal representative, and next friend of Tyler's minor children, and on behalf of herself and other statutory beneficiaries. We will refer to all of these parties collectively as "plaintiffs."

which the trial court received evidence in accord with the above-recited facts, the jury returned its verdict in favor of the plaintiffs and awarded $1,304,456 in damages. The verdict included jury interrogatories in which the jury expressly stated that it found Tyler to have been of unsound mind at the time of his death and that Molchon's negligence was a proximate cause of Tyler's death. In a final order dated May 19, 2000, the trial court confirmed the jury's verdict and reduced the award to $875,000, reflecting the statutory cap on recoveries for medical malpractice actions, Code § 8.01-581.15, and a credit under Code § 8.01-35.1 for amounts already received in a settlement with the hospital.

Because Molchon's appeal of this judgment is limited to certain discrete issues, we will recite other relevant facts and proceedings within the discussion of the assignments of error.

DISCUSSION

At the outset, we note that Molchon has not assigned error to the issue whether his treatment fell below the applicable standard of care and, thus, that he was negligent in discharging Tyler without assuring that Tyler would be immediately placed in a structured living situation. Furthermore, both parties concede that Tyler's assault on Lt. Patton was committed with the intent of provoking a lethal response and, thus, was, in their terms, a "suicide by cop."

7

In his first assignment of error, Molchon contends that the trial court erred in failing to strike the plaintiffs' evidence on the ground that Tyler's conduct, whether considered an assault or a suicide, was an illegal act which resulted in his death and, thus, bars any recovery in tort.  Molchon asserts that although the evidence showed that Tyler was legally intoxicated at the time of his death, voluntary intoxication is not a defense to his illegal act of suicide, and was not evidence that Tyler was of unsound mind at that time.

In the abstract, Molchon's contention that a plaintiff may not recover for an injury received as the result of another's negligence if the plaintiff voluntarily was involved in an illegal act at the time the injury occurred is a correct statement of law.  See Lee v. Nationwide Mutual Insurance Co., 255 Va. 279, 282, 497 S.E.2d 328, 329 (1998); Miller v. Bennett, 190 Va. 162, 164-65, 56 S.E.2d 217, 218 (1949).  Molchon concedes, however, that if the illegal act in question is the victim's suicide, and the suicide was the result of the victim being of unsound mind at the time of his death, the defense of illegality will not bar recovery.  See Wackwitz v. Roy, 244 Va. 60, 65-66, 418 S.E.2d 861, 865 (1992).

Molchon's argument on this issue is directed entirely to the fact that Tyler was voluntarily intoxicated at the time of his death.  However, there is considerable evidence in the

8

record supporting the conclusion that, for reasons unrelated to his intoxication, Tyler was of unsound mind at the time he assaulted Lt. Patton in an effort to commit suicide. In addition to the testimony offered by several experts on behalf of the plaintiffs, Molchon's own diagnosis of Tyler during the time he was under Molchon's care establishes that Tyler suffered from multiple psychological conditions. Thus, the evidence amply supported submission of the issue as to whether Tyler was of unsound mind at the time of his death to the jury.

Molchon's second assignment of error states:

> The trial court erred in its jury instruction on unsound mind as it was not an accurate or correct statement of the law as intoxication is not evidence of unsound mind.

On brief, Molchon contends that the trial court's "instruction of unsound mind did not state that Mr. Tyler, due to disease of mind, had an irresistible impulse to kill himself (the criminal act at issue in this suicide case) but rather that he had an irresistible impulse to drink." He further contends that "[u]nder the Circuit Court's instruction, every alcoholic who had an irresistible impulse to drink would be permitted to argue insanity as a defense to any crime."

The portion of the jury instruction upon which Molchon relies provided that the jury could find that Tyler was of unsound mind if "he was unable to resist the impulse to engage

9

in the behavior that led to his death." Nothing in this instruction, or in any of the other instructions proffered by the plaintiffs and approved by the trial court on the issue of Tyler's mental state at the time of his death, addresses the issue of Tyler's intoxication. Molchon's reading of the instruction is premised on his contention that the plaintiffs relied solely on Tyler's intoxication as the basis for his behavior on the night of his death, a premise that we have already demonstrated is not supported by the record. Moreover, Molchon proffered and the trial court approved an instruction which expressly stated that "the fact of intoxication is not in and of itself evidence of a person's unsoundness of mind." Accordingly, we find no merit in Molchon's contention that the trial court erred in instructing the jury on this issue.

In his third assignment of error, Molchon contends that the trial court erred in failing to strike the plaintiffs' evidence on the ground that there was insufficient evidence that his negligence was a proximate cause of Tyler's death. Molchon's position, as stated in the assignment of error, is again premised on his contention that "the decedent's intoxication was the direct cause of decedent's death" and that "even had the alleged negligent act not occurred, the same opportunity for drinking would have occurred."

Even apart from the reasons we have already given for rejecting Molchon's premise that Tyler's death could have resulted from no other cause than Tyler's being intoxicated, we find no merit in this assignment of error.  There may be more than one proximate cause of an event.  Panousos v. Allen, 245 Va. 60, 65, 425 S.E.2d 496, 499 (1993).  Moreover, when the evidence does not wholly exclude a defendant's negligence as a contributing cause of the plaintiff's injuries as a matter of law, proximate causation becomes a question of fact for the jury's determination.  See Brown v. Koulizakis, 229 Va. 524, 531-32, 331 S.E.2d 440, 445 (1985).

Here, the evidence showed that Molchon was acutely aware of Tyler's suicidal tendencies and the likelihood that he would suffer a relapse if he were not properly supervised upon his discharge from Dominion Hospital.  This evidence alone raised a jury question whether Molchon's allowing Tyler to be discharged was a proximate cause of his suicide less than 48 hours later.  Accordingly, we hold that the trial court did not err in overruling Molchon's motion to strike the plaintiffs' evidence on this ground.

CONCLUSION

For these reasons, the judgment of the trial court will be affirmed.[2]

Affirmed.

---

[2]Molchon also contends that the trial court erred in ruling during pre-trial motions that he could not present evidence that Tyler's insurance carrier improperly denied coverage for his request to be readmitted to Dominion Hospital on the night of his death.  However, the argument Molchon makes on brief does not relate to the basis of the objection he made at the time of the ruling to which he has assigned error.  Rather, the argument is one that was subsequently raised in a post-trial motion to set aside the verdict.  Molchon has not assigned error to the trial court's denial of that motion, and, indeed, he makes no reference on brief to this aspect of the trial whatsoever. Accordingly, the argument was not the basis of "the objection . . . stated with reasonable certainty at the time of the ruling" to which the assignment of error relates, and we will not consider that argument as a basis for reviewing that ruling. Rule 5:25; Cardinal Holding Co. v. Deal, 258 Va. 623, 629, 522 S.E.2d 614, 618 (1999).  Similarly, we will not consider Molchon's further contention, made within the same argument, that the trial court erred in giving a "concurrent negligence" instruction, since this argument bears no relation to this or any other assignment of error.  Rule 5:17(c).